1999 UT 86

**Lee CHEVES, individually and derivatively on behalf of Industrial Communications, Inc., Plaintiff and Appellee,**

v.

**David R. WILLIAMS, Deanna M. Williams, and Industrial Communications, Inc., a Utah Corp., Defendants and Appellants.**

No. 950404.

Supreme Court of Utah.

Sept. 10, 1999.

Steven G. Crockett, Milo Steven Marsden, Wesley D. Felix, Salt Lake, for plaintiff.

Mary Anne Q. Wood, Kathryn O. Balmforth, Salt Lake, for defendants.

DURHAM, Associate Chief Justice.

¶ 1 This case is before us on appeal from a jury verdict and various district court orders in favor of the appellee, Lee Cheves, on his claim against the appellant, David R. Williams, for a partnership accounting and for one-third of the assets belonging to that partnership. We affirm in part and reverse in part.

## BACKGROUND

¶ 2 In reviewing a jury verdict, this court views the facts, and all reasonable inferences

therefrom, in a light most favorable to that verdict. *See State v. Dunn*, 850 P.2d 1201, 1205 (Utah 1993). We present the facts accordingly.

¶ 3 Lee Cheves met David R. Williams in 1958 or 1959, while Cheves was a student at New Mexico State University in Las Cruces, New Mexico. At the time, both Cheves and Williams worked at the White Sands Missile Range in White Sands, New Mexico. Cheves began working for Williams in two small businesses that Williams operated out of his home, and the two became good friends. They soon began talking about going into business together and, by 1962, Cheves had accepted Williams' offer to become partners in a communications business. Under their agreement, Williams would own a two-thirds interest in the business because Williams was the one putting up the money and had greater experience in the communications field, and Cheves would own a one-third interest in the business.

¶ 4 The two thus formed Industrial Communications. Williams opened the business in Vernal, Utah, on April 1, 1963. Cheves joined Williams in Vernal in June 1963, after graduating from college. Each party agreed to take only so much money out of the business as each needed for support, with Williams taking about twice as much as did Cheves. All other profits would remain with the company. Partnership tax returns were filed throughout this period, which indicated that Williams and Cheves were co-partners in Industrial Communications.

¶ 5 Over the next several years, Industrial Communications expanded its operations into northern Utah and Wyoming. The company opened an office in Salt Lake City in 1966. Williams managed the Salt Lake office; Cheves remained in Vernal. Williams and his wife maintained the company's records at the Salt Lake office and were responsible for signing company checks. Neither Williams nor his wife kept track of how much money they took out of the partnership as personal income.

¶ 6 In 1981, assets from Industrial Communications were used to establish a corporation called General Broadcasting, Inc., which operated an AM radio station in North Salt Lake City. Two other corporations, Utah Telcourier, Inc. and Intermountain Broadcasting, Inc., were also established using Industrial Communications' assets.

¶ 7 Industrial Communications, Inc., was incorporated on January 5, 1987. Cheves signed the corporation's articles of incorporation and a document indicating that he was to receive twenty percent of the corporation's shares. Cheves trusted Williams to make up the difference between Cheves' one-third interest in the partnership and the twenty percent interest given him in the corporation. No partnership assets were ever formally transferred into Industrial Communications, Inc.

¶ 8 Also in 1987, Williams expanded the business to Hawaii, forming a corporation named General Telcourier, Inc. By 1988, Williams was spending approximately eight months of the year in Hawaii.

¶ 9 Cheves left Industrial Communications in September 1990. He requested a formal accounting of the partnership by letter on March 14, 1991.

¶ 10 Cheves filed the current action on April 15, 1991. In his first amended complaint, Cheves requested a declaratory judgment regarding the existence of a partnership, as well as an equitable or statutory accounting of the business for the period from June 1963 to the present. Cheves' complaint also stated causes of action for breach of fiduciary duty, breach of contract, fraud and conspiracy to commit fraud, fraudulent transfer of assets and conspiracy to commit such fraudulent transfers, and conversion.

¶ 11 On December 6, 1991, the trial court heard argument on Williams' motion to disqualify the law firm of Giauque, Crockett, Bendinger & Peterson ("Giauque") from representing Cheves. Giauque had represented some of the partnership's affiliated corporations for a period in the mid–1980's, and Williams argued that such representation required Giauque's disqualification in this case. The trial court denied Williams' motion, stating orally that it did "not find there was a substantially [sic] factual relationship between this present action and any other prior

discussions that would have occurred between counsel for the plaintiff in this case and Mr. Williams" and "that there would likely be no information that would have been discussed in those matters that would have formed a basis for use by plaintiff's counsel to the disadvantage of Mr. Williams."

¶ 12 On July 21, 1992, the trial court heard argument on Williams' motion for partial summary judgment, in which Williams asserted that Cheves had waived his right to an accounting by failing to request it promptly. On August 19, 1994, the trial court heard argument on Williams' motion for final partial summary judgment regarding the existence of a partnership. The court denied both motions.

¶ 13 On January 17, 1995, the trial court heard argument on a motion relating to the burden of proof on the existence of a partnership, on the accounting, and on a motion relating to prejudgment interest. The court ruled that, because

> "the books and records of Industrial Communications were maintained under the virtually exclusive control of the Defendants[,] ... if Mr. Cheves proves that a partnership exists, the burden of proof regarding whether partnership funds were used to acquire assets that the Williams [sic] claim are [personal] property ... shifts to the Defendants. Likewise the Court rules that the burden of proof for an accounting shifts to the Defendants."

The court further ruled that "if prejudgment interest is proper in this case, it is to be assessed by the Court and not the jury. *However, the parties may submit to the jury a special interrogatory to determine the date from which prejudgment interest begins to run under the facts of this case.*" (Emphasis added).

¶ 14 Trial on Cheves' complaint began on January 31, 1995, and continued until February 15, 1995. The jury returned a Special Verdict Form on February 16, 1995, in which the jury found: that Cheves and Williams were partners in Industrial Communications; that Cheves' claims were not barred by any statute of limitations, laches, estoppel, failure of consideration or waiver; that the partnership included the assets of General Broadcasting, Inc., General Telcourier, Inc., Utah Telcourier, Inc., and Intermountain Broad-

casting, Inc.; and that Cheves should receive $900,000 for his interest in the partnership. In a judgment dated March 13, 1995, the court ordered that Cheves recover costs plus $900,000, with postjudgment interest. On March 23, 1995, Cheves filed a Motion to Amend Judgment, requesting that the court, pursuant to section 48–1–39 of the Utah Code, add prejudgment interest to the award running from the date Cheves first demanded an accounting. Orders restraining the Williams and Industrial Communications, Inc., from disposing of any nonexempt property were dated March 28, 1995. A Praecipe was signed March 29, 1995. On July 17, 1995, Williams filed a Motion for Stay of Judgment Pending Appeal and for Establishment of Amount of Approved Security.

¶ 15 On July 18, 1995, the trial court heard argument on Cheves' motion to amend the judgment and on Williams' motion for new trial. The court granted Cheves' motion, awarding prejudgment interest to be calculated from April 15, 1991; the court denied Williams' motion for new trial. On August 10, 1995, Williams objected to the proposed order because it allowed for calculation of postjudgment interest on prejudgment interest. The court denied the objection. Williams filed a notice of appeal on September 11, 1995.

¶ 16 On November 6, 1995, the trial court heard argument on Williams' motion for a stay of judgment pending appeal. At that time, Cheves apparently moved for an order allowing the issuance of writs of execution and garnishment directly against property held in the names of Industrial Communications, General Broadcasting, Inc., General Telcourier, Inc., Utah Telcourier, Inc., and Intermountain Broadcasting, Inc. On November 20, 1995, the court denied Williams' motion for a stay and granted Cheves' motion for writs of execution to be issued directly against the corporations.

## ANALYSIS

¶ 17 Williams raises numerous issues on appeal. First, Williams asserts that the trial court erred in instructing the jury concerning the application of Utah Code Ann. § 78–

12–35 (1987) and the discovery rule to toll the statutes of limitations on Cheves' partnership causes of action and erred in accepting the jury's verdict on those issues where the statutes of limitations had in fact run. Second, Williams contends that the trial court erred in entering a money judgment against him where Cheves prevailed only on his accounting claims and where the jury was never instructed concerning how to conduct a partnership accounting. Third, Williams asserts that the trial court improperly awarded prejudgment interest on the jury's award and that the court improperly included that prejudgment interest in the base amount upon which postjudgment interest was calculated. Fourth, Williams argues that the trial court erred in entering an order, after Williams had filed an appeal in this matter, allowing execution directly against Williams' interest in corporate entities that were nonparties to the action. Finally, Williams claims that the trial court erred in failing to disqualify Giauque from representing Cheves in this matter. We address each issue in turn.

## I. STATUTE OF LIMITATIONS— TERMINATION OF PARTNERSHIP

¶ 18 Williams argues on appeal that the trial court erred in its instructions to the jury regarding the application of the statutes of limitations to Cheves' causes of action. Williams claims that the statutes of limitations on Cheves' partnership claims began to run when the partnership was dissolved, that the latest date on which dissolution occurred was when Industrial Communications, Inc., was incorporated on January 5, 1987, and that no tolling provision applied to extend Cheves' causes of action beyond the four years stated in Utah Code Ann. § 78–12–35. Thus, according to Williams, Cheves' complaint, filed on April 15, 1991, was barred by the statutes of limitations.

¶ 19 Cheves responds that Williams' statutes of limitations argument is meritless be-

cause the district court specifically indicated to Williams that he could request that the jury determine the specific date on which the partnership was dissolved, because Williams failed to make that request, and because the trial court's subsequent determination that the dissolution occurred at the time of Cheves' filing his complaint was proper under Rule 49(a) of the Utah Rules of Civil Procedure.[1]

¶ 20 "We review challenges to jury instructions under a 'correctness' standard." *Steffensen v. Smith's Management Corp.*, 862 P.2d 1342, 1346 (Utah 1993). "However, to reverse a trial verdict, this court must find not a mere possibility, but a reasonable likelihood that the error affected the result." *Id.* at 1347. Furthermore, we will not reverse a jury verdict where there is sufficient evidence in the record to support the jury's verdict on legally sound grounds, particularly where the complaining party essentially invited the alleged error by failing to avail itself of the opportunity—offered at trial—to avoid such error. *See State v. Anderson*, 929 P.2d 1107, 1109 (Utah 1996); *State v. Dunn* 850 P.2d 1201, 1220 (Utah 1993). "We have held repeatedly that on appeal, a party cannot take advantage of an error committed at trial when that party led the trial court into committing the error." *Dunn*, 850 P.2d at 1220 (footnote omitted). Such a rule "discourages parties from intentionally misleading the trial court so as to preserve a hidden ground for reversal on appeal." *Id.* (citations omitted).

¶ 21 In this case, Williams challenges the jury's finding that the statutes of limitations had not run on Cheves' partnership claims. "It is generally accepted that a statute of limitations begins to run upon the occurrence of the last event required to form the elements of the cause of action." *Williams v. Howard*, 970 P.2d 1282, 1284 (Utah 1998). Instruction 37 set forth this principle and defined the following applicable statutes of limitation:

---

1. Cheves claims that implicit in the trial court's determination that prejudgment interest should run from the date Cheves filed his complaint was an affirmative finding by the court that the partnership dissolved on that date. However, because the trial court did not give a reason for its determination that prejudgment interest would run from that date, we cannot accept Cheves' assertion. *See Part IV infra.*

1. Accounting. The applicable statute of limitations requires a plaintiff to file a suit for an accounting within four years after the date the partnership was dissolved.

2. Partnership Claim. The applicable statute of limitations requires a plaintiff to file suit alleging the existence of a partnership within four years after he knew or should have known facts indicating that a partnership did not exist.

Although generally objecting that the trial court did not accept his proposed instructions, Williams did not specifically object to Instruction 37. Williams did, however, object to Instructions 38 and 39. Instruction 38 provided:

Regardless of when a cause of action accrues, under Utah law statutes of limitations do not run during periods of time when the Defendant is not in the State of Utah. Thus, if a Defendant is outside the State of Utah eight (8) months per year, the statute would run only during the remaining four (4) months per year when the Defendant was in the State of Utah.

Williams claimed that this instruction incorrectly provided for tolling of the statutes of limitations whenever Williams was absent from the state, regardless of whether Williams was amenable to personal service under Utah law during his absence.[2]

¶ 22 Instruction 39 provided:

The statute of limitations does not begin to run until the party against whom the statute is asserted knows or has reason to know of the facts forming the basis for the cause of action. Similarly, concealment or misleading a party prevents that party from relying on the statute of limitations.

Williams claimed that this instruction incorrectly provided that the discovery rule could apply to Cheves' partnership claims.

¶ 23 Finally, in connection with his statutes of limitations argument, Williams claimed error in Instructions 18 and 19. Instruction 18 provided:

If you find that Mr. Williams and Mr. Cheves formed a partnership, then you must decide the date it was dissolved. A partnership may be dissolved at any time by the express will of one partner or by the will of all the partners. If a partnership is incorporated, then the partnership is normally dissolved on the date of incorporation and the parties cease to be partners on that date. You have been informed through evidence that Articles of Incorporation were filed on January 5, 1987, and that a Certificate of Incorporation was issued on that date. Under Utah law, a Certificate of Incorporation is conclusive proof of the creation of a corporation.

At trial, Williams objected to the "normally dissolved" language in this instruction, arguing that case law supported his contention that "a partnership is automatically dissolved on the date of incorporation."

¶ 24 Instruction 19 provided:

As a general rule, when partners organize a corporation to operate the business of the partnership and transfer the assets of the partnership to the corporation, the partnership is dissolved. The partnership may continue for purposes of winding up of partnership affairs. This may include the process of settling the partnership accounts, and transferring partnership assets to the corporation in exchange for corporate stock.

Williams objected to this instruction at trial, again primarily because it conflicted with his assertion that a partnership dissolves and terminates upon incorporation.

¶ 25 Notwithstanding Williams' objection to these jury instructions, Williams did not request, in either of his two proposed special verdict forms, that the jury identify the specific date of the partnership's dissolution or any other facts that might clarify the facts upon which the jury relied in finding the statutes of limitations inapplicable. With regard to the dissolution date question, we find

---

2. This instruction represents the trial court's interpretation of section 78–12–35 of the Utah Code. Section 78–12–35 provides, in relevant part, that "[i]f after a cause of action accrues

[against a person], he departs from the state, the time of his absence is not part of the time limited for the commencement of the action." *Utah Code Ann.* § 78–12–35 (1987).

this failure particularly disturbing, because the trial court had (in its ruling on the determination of prejudgment interest) specifically stated that "the parties may submit to the jury a special interrogatory to determine the date from which prejudgment interest begins to run under the facts of this case." Because "the date from which prejudgment interest begins to run" is at least potentially the same date from which the statutes of limitations would have begun to run, and because a factual finding regarding the date would likely have clarified the basis of the jury's conclusions regarding the running of the statutes of limitations, Williams' failure to include such a question on his proposed special jury forms is significant. In light of this failure, we conclude that Williams' argument on appeal survives only if we can conclude as a matter of law that the statutes of limitation on Cheves' causes of actions began running no later than the latest date asserted by Williams—the date upon which Industrial Communications, Inc., was incorporated. Such a conclusion would render Instructions 18 and 19 so erroneous that Williams' failure to request a specific date of dissolution would not allow us to avoid the question of whether there is a reasonable likelihood that any alleged errors in Instructions 38 and 39 affected the jury's verdict. *See Steffensen,* 862 P.2d at 1347.

¶ 26 As Williams contends, section 48–1–40 of the Utah Code provides that "[t]he right to an account of his interest shall accrue to any partner or his legal representative as against the winding-up partners or . . . the person or partnership continuing the business, at the date of dissolution in the absence of any agreement to the contrary." Utah Code Ann. § 48–1–40 (1989). Williams then asserts that any partnership existing between Williams and Cheves dissolved, as a matter of law, when Industrial Communications, Inc., was incorporated.

■ ¶ 27 To determine whether Industrial Communications dissolved as a matter of law upon the filing of articles of incorporation for a similarly named corporation, we begin by looking at our statutes governing partnerships. Section 48–1–26 of the Utah Code defines "dissolution" as "the change in the

relation of the partners caused by any partner ceasing to be associated in the carrying on, as distinguished from the winding up, of the business." *Id.* § 48–1–26. Sections 48–1–28 and 48–1–29 of the Code then set forth how dissolution may occur. Section 48–1–28 provides that dissolution is caused:

(1) Without violation of the agreement between the partners:

(a) By the termination of the definite term or particular undertaking specified in the agreement.

(b) By the express will of any partner when no definite term or particular undertaking is specified.

(c) By the express will of all the partners who have not assigned their interests, or suffered them to be charged for their separate debts, either before or after the termination of any specified term or particular undertaking.

(d) By the expulsion of any partner from the business bona fide in accordance with such a power conferred by the agreement between the partners.

(2) In contravention of the agreement between the partners, where the circumstances do not permit a dissolution under any other provision of this section, by the express will of any partner at any time.

(3) By any event which makes it unlawful for the business of the partnership to be carried on or for the members to carry it on in partnership.

(4) By the death of any partner.

(5) By the bankruptcy of any partner or the partnership.

(6) By decree of court under Section 48–1–29.

*Id.* § 48–1–28. Section 48–1–29 provides:

(1) On application by or for a partner the court shall decree a dissolution whenever:

(a) A partner has been declared a lunatic. . . .

(b) A partner becomes in any other way incapable of performing his part of the partnership contract.

(c) A partner has been guilty of such conduct as tends to affect prejudicially the carrying on of the business.

(d) A partner willfully or persistently commits a breach of the partnership agreement, or otherwise so conducts himself in matters relating to the partnership business that it is not reasonably practicable to carry on the business in partnership with him.

(e) The business of the partnership can only be carried on at a loss.

(f) Other circumstances render dissolution equitable.

(2) On the application of the purchaser of a partner's interest. . . .

*Id.* § 48–1–29.

¶ 28 Neither of these provisions provides that the incorporation of a like-named corporation definitively or automatically establishes the dissolution of a partnership. Rather, the statutes focus on the express intent of one or more partners to achieve dissolution and the action taken by such partner(s) to obtain that objective.

¶ 29 The cases from other jurisdictions upon which Williams relies do not contradict this reading. They do not establish a rule of automatic dissolution, but merely recognize that incorporation alone may be sufficient evidence for the factfinder to conclude that the partners expressly and mutually agreed to transform their partnership into a corporation. *See, e.g., Charles M. Woods Co. v. Armstrong,* 101 Cal.App. 664, 282 P. 19, 19 (1929) (rejecting appellant's contention "that without any proof of the transfer to the corporation of the partnership assets or without proof of dissolution we must assume that the copartnership ceased to exist on the date of the incorporation"; stating that "copartnership for one reason or another might have continued to exist for a considerable period of time subsequent to the incorporation"); *Hooper v. Yoder,* 737 P.2d 852, 858 (Colo. 1987) (en banc) (stating general rule that "when partners organize a corporation to operate the business of the partnership and transfer the assets to the corporation, the partnership is dissolved" and explaining that "[t]his is so because such action *usually* reflects the express will of the parties that the partnership be dissolved" (emphasis added)); *id.* (finding "no support in the record for a finding that the parties intended that the partnership would continue after the corporation was organized"); *Adkins v. Hash,* 190 Va. 86, 56 S.E.2d 60, 63 (1949); *Box v. Crowther,* 3 Wash.App. 67, 473 P.2d 417, 421–22 (1970); *see also* 59A Am.Jur.2d *Partnership* § 841 at 651–52 (1987) ("The mere incorporation . . . without further action to transfer some or all of the partnership assets and business to the corporation will not dissolve the partnership.").

■ ¶ 30 The evidence in this case is in dispute as to what the parties intended upon incorporation. Williams testified that he and Cheves were never business partners and thus that there was no partnership to dissolve. Alternatively, he asserted that the partnership was dissolved upon incorporation of Industrial Communications, Inc., and Cheves' acceptance of a twenty percent interest in the corporation. Cheves, on the other hand, testified that he participated in the incorporation of Industrial Communications, Inc., only upon the understanding that the partnership's assets would be "rolled into" the corporation and that he would receive compensation for his interest in the partnership over and above the twenty percent of corporate stock he received. Furthermore, Cheves testified that he did not leave the company until 1990 and that even at that time he believed he had the rights of a partner in the business. Finally, the evidence indicated that none of the partnership's assets had been transferred to the corporation prior to Cheves' filing his complaint. Thus, it was for the jury to decide whether the changes that occurred after incorporation of Industrial Communications, Inc., constituted a "change in the relationship of the partners caused by any partner ceasing to be associated in the carrying on, as distinguished from the winding up, of the business." Utah Code Ann. § 48–1–26. We hold that there was sufficient evidence in this case for the jury to conclude that dissolution of the partnership did not occur at the time of the corporation's incorporation, but rather occurred at a later date that placed Cheves' complaint within the statutes of limitations.

¶ 31 We therefore conclude that Instructions 18 and 19 sufficiently set forth the correct legal principles, for this case, con-

cerning incorporation and dissolution of a partnership. The first sentence of Instruction 18 correctly sets forth the means of dissolution defined under section 48–1–28. The remaining portions of Instruction 18 and the whole of Instruction 19 then set forth the type of evidence relevant to determining the partners' will under the first sentence of Instruction 18.

¶ 32 Although we agree with Williams that, because the jury was not required to specify the date of the partnership's dissolution, there is no way to verify that the dissolution date found by the jury actually fell within the statutes of limitations, we conclude that Williams could have avoided the uncertainty of which he now complains, and we will presume the accuracy of the jury verdict. As previously noted, the trial court specifically informed the parties in its pre-trial ruling on prejudgment interest that, although the court would reserve for itself calculation of prejudgment interest, the parties would be free to include questions relevant to the starting date for such interest on the special jury form. This ruling was an open invitation to request that the jury specifically resolve the question of the date of dissolution of the partnership. Williams did not avail himself of that invitation. By not doing so, Williams not only arguably invited the error he now claims but also failed to provide this court with a sufficient record to reach his claim. Under these circumstances, and where the evidence supports the finding of a dissolution date within the statutes of limitations, we reject Williams' argument.

## II. ACCOUNTING

■ ¶ 33 Williams also argues that the trial court improperly allowed the jury to determine damages when Cheves' sole remedy was an accounting of the partnership assets in preparation for settlement between the partners. Cheves counters that Williams waived the error when, after his objection was challenged at trial, he rescinded the objection and agreed to have the jury decide all matters. Alternatively, Cheves argues that the jury determined only "the amount

necessary to settle accounts between Cheves and Williams" and that "[f]requently, courts permit alternate resolutions of partnership interest and can enter a money judgment as a means of settling the accounts between the partners."

¶ 34 Question 5 of the Special Verdict Form asked the jury to determine "[w]hat amount of money would compensate Mr. Cheves for his interest in the alleged partnership." The corresponding jury instruction, Instruction No. 27, provided:

If you decide that one or both of the defendants are liable to the plaintiff, you must decide how much money will reasonably compensate the plaintiff for any injury or loss proximately caused by the defendants' conduct.

In awarding the plaintiff compensation, you should consider the amount needed to place the plaintiff in the same position in which the plaintiff would have been but for the defendants' conduct.

Williams asserts that the combination of the jury instruction and the jury question erroneously allowed the jury to determine compensatory damages against Williams in contravention of the Utah Partnership Act, which provides that the only remedy among co-partners is an accounting.

¶ 35 Cheves argues that Williams accepted these instructions when he agreed in a compromise at trial to submit the accounting to the jury. We disagree. First, we believe that, on appeal, Williams does not so much challenge the jury's ability to decide how much was owed Cheves in settlement of the partnership as he does the instructions actually given to the jury concerning how that amount must be calculated. Specifically, Williams appears to argue that the jury should have been instructed on the statutory requirements for the settlement of a partnership. A review of the record indicates that, although Williams did agree to submit the accounting to the jury, he objected to the jury instruction in question. Under these circumstances, we cannot say that Williams' claim has been waived.[3]

---

**3.** Part of the difficulty in addressing this issue is that both parties at trial seemed to refer to the

monetary value of Cheves' partnership interest as "damages." Thus, Williams himself, in "Defen-

¶ 36 Section 48–1–15 of the Utah Code sets forth the rules governing the rights of partners in the partnership absent any agreement between the partners. Subsection (1), for example, provides that "[e]ach partner shall be repaid his contributions ... and share equally in the profits and surplus remaining after all liabilities ... are satisfied." Utah Code Ann. § 48–1–15(1) (1989). Section 48–1–35 then sets forth the rights of partners to the application of partnership property upon dissolution. Subsection (1) of that section provides, in part, that, upon dissolution, "each partner, as against his copartners ..., unless otherwise agreed, may have the partnership property applied to discharge its liabilities, and the surplus applied to pay in cash the net amount owing to the respective partners." *Id.* § 48–1–35(1). Finally, section 48–1–37 sets forth the rules for distribution "[i]n settling accounts between the partners after dissolution." *Id.* § 48–1–37. This section defines the assets of the partnership for distribution purposes, as well as the liabilities of the partnership and the order in which such liabilities must be paid. *See id.* Section 48–1–5 sets forth the definition of partnership property that is included in the partnership's assets under section 47–1–37. *See id.* § 48–1–5.

 ¶ 37 At trial, Williams asserted that the jury should have been instructed as to the statutory elements that must be considered in determining a partner's partnership interest upon dissolution. Consistent with this assertion, Williams' requested jury instructions included instructions on the division of partnership profits and losses, the right to an accounting, and rules for distribution after dissolution.

Whether a trial court properly instructed the jury is a question of law, which we review for correctness. In reviewing a jury instruction, we consider the challenged instruction in context. "As we have repeatedly held, if the jury instructions as a whole fairly instruct the jury on the applicable law, reversible error does not arise merely because one jury instruction, standing alone, is not as accurate as it might have been."

*Jensen v. Intermountain Power Agency,* 977 P.2d 474, 478 (Utah 1999) (quoting *Bott v. DeLand,* 922 P.2d 732, 741 (Utah 1996)) (other citations omitted). Furthermore, an error in jury instructions may be harmless where the error is " 'sufficiently inconsequential so that no reasonable likelihood exists that the error affected the outcome of the proceedings.' " *C.T. v. Johnson,* 977 P.2d 479, 484 (Utah 1999) (quoting *Jones v. Cyprus Plateau Min. Corp.,* 944 P.2d 357, 360 (Utah 1997)); *see also C.T.,* 977 P.2d at 484 (stating that we review "all of the jury instructions, the evidence, and closing arguments" to determine whether "it is highly probable that the jury considered each of the relevant ... factors during their deliberations even though not specifically instructed to do so"). Finally, we will not reverse for errors in jury instructions if the complaining party "fail[s] to demonstrate how the court's refusal to adopt their proposed jury instructions prejudiced them." *Walker Drug Co. v. La Sal Oil Co.,* 972 P.2d 1238, 1249 (Utah 1998).

 ¶ 38 Unfortunately, the actual discussion concerning objections to proposed jury instructions in this case was not held on the record. Thus, we have no record of the basis upon which the trial court rejected Williams' requested instructions. It could be that, under the specific circumstances of this case, the trial court determined that such instructions would have caused more confusion for the jury than clarification. Williams had the burden of proof regarding the partnership accounting, but he presented very little evidence concerning the partnership's assets, profits, debts, etc. Thus, a complete and accurate accounting as prescribed by the statutes was impossible. Under such circumstances, strict recitation of the statutory factors could have unnecessarily confused the

---

dants' Second Requested Special Verdict Form," included as question 12: "What amount of money would compensate Mr. Cheves for his alleged partnership interest in Industrial Communications?" However, when one reviews the actual jury instructions requested in connection with this question, one finds that Williams did in fact expect this amount to be calculated based upon the type of settlement accounting contemplated in the Utah Partnership Act, Utah Code Ann. §§ 48–1–1 to –40 (1989).

jury, implying that the jury had to consider factors for which there was no evidence.

¶ 39 Furthermore, on appeal, Williams has provided no indication, beyond a cursory statement, of how he was prejudiced by the allegedly erroneous instruction. For example, he does not cite any evidence in the record that the jurors ignored due to the instruction, nor does he indicate how the jury's verdict would have probably been different had a more descriptive instruction been given. Under these circumstances, the jury instructions were not sufficiently erroneous for us to conclude that a " 'reasonable likelihood exists that the error affected the outcome of the proceedings.' " *C.T.*, 977 P.2d at 484 (citation omitted).

### III. INTEREST

¶ 40 Williams also argues on appeal that the trial court erred in awarding Cheves prejudgment interest on the jury's monetary damages amount. Williams argues that the amount of damages was sufficiently indefinite to make the prejudgment interest award improper. He also argues that prejudgment interest was improper because the jury did not specify the date upon which it valued Cheves' partnership interest.

¶ 41 "A trial court's decision to grant or deny prejudgment interest presents a question of law which we review for correctness." *Cornia v. Wilcox*, 898 P.2d 1379, 1387 (Utah 1995). In this case, the interest determination is governed by section 48–1–39 of the Utah Code, which sets forth the remedies available to partners of a dissolved partnership. *See MacKay v. Hardy*, 896 P.2d 626, 630 (Utah 1995). Section 48–1–39 provides that a partner

> may have the value of his interest at the date of dissolution ascertained, and shall receive as an ordinary creditor an amount equal to the value of his interest in the dissolved partnership with interest, or, at his option . . . , in lieu of interest, the prof-

its attributable to the use of his right in the property of the dissolved partnership. Utah Code Ann. § 48–1–39 (1989).

¶ 42 Under this statute, then, if the complaining partner chooses the first option, the value of his interest is determined as of the date of the partnership's dissolution, and interest is calculated from the date of dissolution to the date of settlement; if the partner chooses the second option, the value of his interest is determined as of the date of the actual settlement and no interest is awarded. *See Schneider v. Schneider,* 347 Mo. 102, 146 S.W.2d 584, 591 (1941). Thus, "[i]f he is entitled to participation in profits he would not be entitled to interest[ and] [i]f interest is allowed, participation in profits could not be allowed." *Id.* As implied by the statute, there must be some factual predicate to the award of prejudgment interest.

¶ 43 In this case, the factual predicate is missing. Neither the jury instructions nor the special verdict form indicated the date upon which Cheves' partnership interest was to be valued. The same issue presented in the "date of dissolution" discussion above, *see supra* ¶ 32, is applicable here. At trial, the court informed the parties that it, not the jury, would determine issues concerning prejudgment interest but that either party could request that the jury find those facts relevant to that determination, such as the date of dissolution or the date as of which the value of Cheves' partnership interest should be calculated. Neither party requested that the jury specify the date. Because the burden was on Cheves to establish the factual predicate supporting his claim for prejudgment interest, we hold that his failure to do so renders the award of prejudgment interest in this case improper.[4]

### IV. EXECUTION DIRECTLY ON NON-PARTY CORPORATIONS DEEMED TO BE PARTNERSHIP PROPERTY

¶ 44 Williams' fourth claim on appeal is that the trial court erred in issuing an order

---

4. Because we reverse the trial court's award of prejudgment interest, we need not reach Williams' claim of error concerning the award of postjudgment interest on top of the prejudgment interest. We do note, however, that Williams' argument concerning the impropriety of award-

ing prejudgment interest in this case because the amount of damages could not "be calculated with mathematical accuracy," *Bjork v. April Indus., Inc.*, 560 P.2d 315, 317 (Utah 1977), is problematic to the extent Williams had the burden of proof on the damages issue.

allowing Cheves to execute directly on corporate assets found by the jury to be property of the partnership. Williams argues that the trial court lacked jurisdiction to issue the order because Williams had already filed his notice of appeal. Williams also argues that the order was improper because a court cannot allow execution on corporate assets where the corporations are not themselves parties to the action. Cheves replies that this court lacks jurisdiction to hear Williams' claim because Williams failed to file a notice of appeal on the execution order. We address the trial court jurisdiction question first.

¶ 45 "This court has long followed the general rule that the trial court is divested of jurisdiction over a case while it is under advisement on appeal." *White v. State,* 795 P.2d 648, 650 (Utah 1990). However, we have also recognized exceptions to that rule, "in the interest of preventing unnecessary delay, where any action by the trial court is not likely to modify a party's rights with respect to the issues raised on appeal," *id.,* or where the action by the trial court is authorized by rule or statute, *see, e.g., Peters v. Peters,* 15 Utah 2d 413, 417, 394 P.2d 71, 73 (1964). In this case, we believe the trial court's jurisdiction was implicitly authorized by rule.

¶ 46 Rule 8 of the Utah Rules of Appellate Procedure provides, in relevant part:

> Application for a stay of the judgment or order of a trial court pending appeal ... or for approval of a supersedeas bond ... must ordinarily be made in the first instance in the trial court. A motion for such relief may be made to the appellate court, but the motion shall show that ... the trial court has denied an application ..., with the reasons given by the trial court for its action.

Utah R.App. P. 8. The plain language of the rule indicates that the trial court has jurisdiction, in the first instance, over a case on appeal to determine whether a stay of the judgment pending appeal should be granted. *See State v. Hunt,* 906 P.2d 311, 312 (Utah 1995) (" 'The best evidence of the true intent and purpose of the Legislature in enacting the Act is the plain language of the Act.' ") (quoting *Jensen v. Intermountain Health Care, Inc.,* 679 P.2d 903, 906 (Utah 1984)); *see also* Utah R. Civ. P. 62(d) (indicating that appellant may obtain stay upon giving of supersedeas bond). The implication of this rule is clear. In order to stay enforcement of a judgment pending appeal, the judgment debtor must, in most cases, apply in the trial court for a stay pending appeal. Absent such application, or in the event the trial court denies such application and the appellant does not apply to the appellate court for a stay, the judgment is immediately enforceable. *See Ketchum Coal Co. v. Christensen,* 48 Utah 214, 222, 159 P. 541, 544 (1916) (stating "[w]hen the judgment is once entered, and under the law is an enforceable judgment, the party in whose favor it is rendered has a clear right to have the same enforced").

¶ 47 There is no automatic stay of execution upon the filing of a notice of appeal. *See Schnier v. District Court,* 696 P.2d 264, 267 (Colo.1985) ("A pending writ of error or appeal does not automatically stay execution."). The absence of such an automatic stay necessarily means that the judgment creditor may execute on the judgment. Included in that ability is the judgment creditor's right to apply to the trial court for assistance in the execution process. *See id.* ("It is elemental that where a judgment is not stayed by a proper order or bond there is no impediment against proceedings in the trial court for the purpose of executing on the judgment."); *In re Marriage of Sara Jane Spiegel,* 553 N.W.2d 309, 321 (Iowa 1996) ("The general rule is that an appellee may invoke the power of the district court to enforce a decree while its correctness is being appealed, unless a supersedeas bond is filed.").

¶ 48 We hold that, absent a stay of judgment either by the trial court itself or by an appellate court pending appeal, a trial court has jurisdiction to enforce its judgment. Because the trial court in this case denied Williams' motion for a stay pending appeal, and because Williams did not apply to this court for such a stay, the trial court had

jurisdiction to issue the challenged enforcement order.

¶ 49 Having decided that the trial court had jurisdiction to enter its execution order, we must now determine whether this court has jurisdiction to review that order. The notice of appeal in this case was filed on September 8, 1995. A motion for the execution order was made on November 6, 1995. The execution order was issued on November 20, 1995. No subsequent notice of appeal was filed. If the execution order constituted a judgment separate and distinct from the underlying judgment being enforced, Williams was required to file a separate notice of appeal to challenge that order and his failure to do so means that this court lacks jurisdiction over his claims of error related to that order. *See Nelson v. Stoker,* 669 P.2d 390, 392 (Utah 1983).

¶ 50 Although there is no Utah case law specifically on point, a review of related case law from our courts and the courts of other jurisdictions convinces us that the execution order issued by the trial court after issuance of the final judgment on liability and damages stands as a separate and distinct order from the underlying judgment and that, as such, to the extent the execution order was a "final order" as defined by Rule 4 of the Utah Rules of Appellate Procedure, Williams was required to file a separate notice of appeal to challenge it.

¶ 51 In the case of *State Tax Commission v. Wright,* 596 P.2d 634 (Utah 1979), the Tax Commission initiated a proceeding under Rule 69 of the Utah Rules of Civil Procedure "to determine the location and amount of the defendant's property for the purpose of satisfying the warrant of judgment," which "at that stage had become a final order" since no appeal had been taken. *Id.* at 635. In the Rule 69 proceeding, the trial court denied Wright's motion to dismiss the warrant of judgment. *See id.* Wright appealed the trial court's ruling, arguing that the tax provisions supporting the original judgment were unconstitutional. *See id.* This court refused to consider Wright's claim "since it could not properly be raised in a supplemental proceeding before the district court in the first place." *Id.*

¶ 52 This holding is consistent with the concept that the initial action resulting in a final judgment and the subsequent action seeking enforcement of that judgment are separate proceedings, each resulting in separate judgments that are then individually subject to the rules of appellate procedure concerning appeals. *See also Cahoon v. Cahoon,* 641 P.2d 140, 142 (Utah 1982) (holding, in appeal of order enforcing divorce decree, that "final judgment rule does not preclude review of postjudgment [enforcement] orders" and that "[s]uch orders are independently subject to the test of finality, according to their own substance and effect"); *Hidden Meadows Dev. Co. v. Mills,* 590 P.2d 1244, 1248–49 (Utah 1979) (rejecting claim in appeal of enforcement order alleging error in underlying judgment; stating "purpose and effect of supersedeas is to restrain the successful party and the lower court from taking affirmative action to enforce a judgment or decree"); *Peters,* 15 Utah 2d at 417, 394 P.2d at 73 (describing divorce modification proceeding as "a new and supplemental proceeding" over which trial court had jurisdiction while original divorce proceeding was on appeal; noting that "it is essential that the trial court have continuing jurisdiction to enforce the rights of the parties").

¶ 53 In *Peters,* this court relied at least partially on the fact that the legislature itself had authorized the trial court to exercise continuing jurisdiction over divorce proceedings. *See Peters,* 15 Utah 2d at 417, 394 P.2d at 73. We conclude that Rules 62 and 69 of the Utah Rules of Civil Procedure, though providing a different procedure, give the trial court similar jurisdiction over new and supplemental proceedings in which a party seeks judicial enforcement of a prior judgment.

¶ 54 Rule 62(a) provides that "[e]xecution or other proceedings to enforce a judgment may issue immediately upon the entry of the judgment." Utah R. Civ. P. 62(a). Rule 69(a) then provides that "[a] writ of execution is available to a judgment creditor to satisfy a judgment or other order requiring the delivery of property or the payment of money by a judgment debtor." *Id.* 69(a). The obvious implication of both these provisions

is that there exists a previously issued final judgment not stayed pending appeal. *Cf. Redding & Co. v. Russwine Constr. Corp.*, 417 F.2d 721, 727 (D.C.Cir.1969) (noting that "[a]n execution ordinarily may issue only upon a final judgment").

¶ 55 Finally, Rule 69(c) provides that such writ "may be issued at any time within eight years following the entry of a judgment or order." *Id.* 69(c). The clear implication of this provision is that the judgment creditor may petition a court for assistance in enforcing the judgment or order at any time within those eight years. It therefore seems obvious that any order issued by the court under Rules 62 and 69 is not—unless specifically incorporated into the original action and order underlying the enforcement order—part of the original proceeding and is not included in any appeal taken from the underlying order.

¶ 56 We therefore hold that because Williams did not apply to this court for a stay of execution pending appeal, and because the execution order, like similar types of post-judgment orders, constituted a separate and distinct order from the one from which Williams actually appealed, we lack jurisdiction over Williams' claims concerning that order.

## V. ATTORNEY DISQUALIFICATION

¶ 57 Williams' final claim on appeal is that the trial court erred in denying his motion to disqualify Cheves' counsel. "[T]he proper standard of review for decisions relating to disqualification is abuse of discretion." *Houghton v. Utah Dep't of Health*, 962 P.2d 58, 61 (Utah 1998). However, "to the extent this Court has a special interest in administering the law governing attorney ethical rules, a trial court's discretion is limited." *Id.* Nevertheless, in order for this court to reverse the trial court's ruling after trial, Williams must demonstrate that any error in failing to disqualify Giauque was prejudicial. *Cf. State v. Neeley*, 748 P.2d 1091, 1094 (Utah 1988) (stating that in appeal after trial of denial of motion to disqualify judge, party appealing must show actual bias even though standard in original motion was lower); *Poly Software Int'l, Inc. v. Yu Su*,

880 F.Supp. 1487, 1495 (D.Utah 1995) (stating "'sanction of disqualification of counsel ... should be measured by the facts of each particular case as they bear upon the impact of counsel's conduct upon trial.... The essential issue to be determined in the context of litigation is whether the alleged misconduct taints the lawsuit'" (quoting *Parkinson v. Phonex Corp.*, 857 F.Supp. 1474, 1476 (D.Utah 1994))); *see also Clark v. Clark*, 319 Ark. 193, 890 S.W.2d 267, 269 (1995) (stating "propriety of the district court's denial of a disqualification motion will often be difficult to assess until its impact on the underlying litigation may be evaluated").

¶ 58 In arguing that the trial court erred in denying his disqualification motion, Williams relies primarily on Rule 1.9 of the Utah Rules of Professional Conduct. Rule 1.9 provides, in pertinent part:

A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) Represent another person in the same or a substantially factually related matter in which that person's interests are materially adverse to the interests of the former client ...; or

(b) Use information relating to the representation to the disadvantage of the former client except ... when the information has become generally known.

Utah R. Prof. Conduct 1.9. In his motion before the trial court, Williams argued that the matters in which Giauque had previously been involved were "substantially factually related" to the present case because Williams had disclosed certain information about the corporations and the partnership during that representation that would be relevant in the present case. In support of his motion, Williams produced an invoice issued by Giauque concerning legal fees associated with the corporations and a check from the partnership made payable to Giauque in payment of that invoice. It is unclear whether Williams offered this documentation to establish that Giauque had previously represented certain of the corporations or to establish that Giauque's prior representation of the corporations was "substantially factually related" to the present case. Otherwise,

Williams relied primarily on his own conclusory statements concerning the factual relationship between Giauque's prior representation and the current case. As it turns out, however, Cheves used the same invoice and check at trial as evidence that the corporations were in fact formed with partnership funds. On appeal, Williams claims that the invoice and check were the sole evidence tending to establish that the corporations were part of the partnership and that Williams was therefore prejudiced by the trial court's denial of his disqualification motion.

¶ 59 This court recently discussed the meaning of "substantially factually related" language in Rule 1.9 in *Houghton.*[5] In that case, we endorsed the interpretation given that phrase by the federal courts and adopted by our court of appeals:

> In construing Utah's Rule 1.9(a), the federal courts and the Utah Court of Appeals have referred to the necessity for a distinct, factual link between the former and present representations. In *SLC Ltd. v. Bradford Group West, Inc.*, 999 F.2d 464, 467 (10th Cir.1993), the United States Court of Appeals for the Tenth Circuit stated that Utah's requirement "focus[es] on the factual nexus between the prior and current representations rather than a narrower identity of legal issues." Similarly, the court in *Poly Software Int'l, Inc. v. Yu Su*, 880 F.Supp. 1487[, 1492] (D.Utah 1995), referred to "substantial factual threads connecting the two matters." *See also State v. Larsen*, 828 P.2d 487, 491–92 (Utah Ct.App.1992) (generally discussing the requirement of substantial factual relation).

*Houghton*, 962 P.2d at 62.

¶ 60 In applying that interpretation to the present case, we first note that conclusory statements concerning the "distinct, factual link" are not sufficient. *See Cache County v. Property Tax Div. of Tax Comm'n*, 922 P.2d 758, 768 (Utah 1996) (stating that "mere conclusory assertions" are insufficient to es-

tablish prejudice); *State v. Arguelles*, 921 P.2d 439, 441 (Utah 1996); *Margulies by Margulies v. Upchurch*, 696 P.2d 1195, 1204 (Utah 1985) ("We recognize that disqualification motions based on very slight appearances of impropriety have been misused for tactical advantage in litigation."). We thus conclude that Williams' general statements concerning the prior representation were insufficient to support Giauque's disqualification.

¶ 61 We focus next on Williams' claim that Giauque's use of the invoice and check at trial on Cheves' behalf resulted in prejudice. Where we are reviewing a denial of a motion to disqualify after trial has been completed, we ·must determine whether the alleged misconduct actually "taint[ed] the lawsuit." *Poly Software*, 880 F.Supp. at 1495. "Proposed factors [for making that determination] include[ ] egregiousness of the violation, degree of prejudice resulting from the violation, extent of diminution of effectiveness of counsel, and equitable considerations such as hardship in obtaining new counsel [and] unfair advantage in the present litigation." *Id.* at 1495 n. 12.

¶ 62 Even assuming that the information used at trial and allegedly obtained through Giauque's prior representation of the corporations was "substantially factually related" to the current case—because the invoice and check were used in this case to establish that the partnership had paid some of the corporations' legal fees—we cannot agree with Williams' claim that he was prejudiced by Giauque's knowledge and use of this evidence. Instead, we conclude that there was sufficient other evidence in the record to support the jury's findings that the corporations' assets were partnership property so as to render the effect of the alleged improper use of the invoice and check insubstantial. Cheves presented evidence that the Williams' sole source of income, prior to the incorporation of the corporations, was the partnership; that the Williams did not keep track of the money they withdrew from the partner-

---

5. Because of our conclusion on this issue, we do not decide whether Giauque's representation of the partnership or its corporations could be considered representation of Williams under Rule

1.9. For purposes of argument, we assume that Williams was one of the "persons" covered by that rule.

ship; that such amounts were apparently substantial; that the Williams' standard of living was significantly higher than Cheves'; and that the Williams still contended without evidence that the money used to fund the corporations was their own. All this evidence supports the jury's findings that the Williams used partnership funds to establish the four corporations, and Williams presented no evidence that the funds came from elsewhere. In light of this evidence, we cannot conclude that the evidence allegedly garnered through Giauque's prior representation was so substantially factually related to the present litigation that the trial court's denial of Williams' motion to disqualify Giauque constituted prejudicial error.

¶ 63 For the above-stated reasons, we affirm the trial court's August 10, 1995 judgment except as to the award of prejudgment interest, which we reverse. Because we do not have jurisdiction over the trial court's November 20, 1995 execution order, we do not address the propriety of that order.

¶ 64 Chief Justice HOWE, Justice STEWART, Justice ZIMMERMAN, and Justice RUSSON concur in Associate Chief Justice DURHAM's opinion.